**J. J. EXON, Plaintiff,**

v.

**Norbert T. TIEMANN, as Governor of the State of Nebraska and as a Member of the State Board of Election Canvassers of the State of Nebraska et al., Defendants.**

**Civ. No. 1268L.**

United States District Court
D. Nebraska.

Nov. 22, 1967.

Norman Krivosha and Patrick Healey, Lincoln, Neb., for plaintiff.

Robert A. Nelson, Sp. Asst. Atty. Gen., Clarence A. H. Meyer, Atty. Gen., Richard H. Williams, Asst. Atty. Gen., State of Nebraska, Lincoln, Neb., for defendants.

## MEMORANDUM

Before LAY, Circuit Judge, and ROBINSON and VAN PELT, District Judges.

### PER CURIAM.

Plaintiff, a citizen of Nebraska and resident of Lancaster County, Nebraska, and of its First Congressional District, and entitled to vote for a United States Representative therein, brings this action to procure reapportionment of the three Congressional Districts of Nebraska. Other portions of the prayer for relief will be referred to at the appropriate time in the discussion which follows. Defendants are the Governor of Nebraska, the other four members of the State Board of Election Canvassers and the Election Commissioner of the county in which plaintiff resides.

Pursuant to Rule 25(d) (1), Federal Rules of Civil Procedure, Dean H. Peterson is substituted as a party defendant, as successor to Betty Jeanne Keller, as Election Commissioner of Lancaster County.

The prayer further requests that the Governor be ordered and directed to call forthwith a Special Session of the Nebraska Legislature to lawfully and properly reapportion the Congressional Districts. This request was stressed in the oral arguments.

Under Art. IV, Sec. 8 of the Nebraska Constitution, the Governor may "on extraordinary occasions", convene the Legislature for special purposes. In addition, any ten of the forty-nine members of the Legislature, by following the procedure set forth in Chapter 50, Section 125, Reissue, Revised Statutes, Nebraska, 1943, may procure a special session for any purpose which the ten members set forth in "a positive statement in writing."

However, no attempt has been made in this case to join the members of the Legislature as defendants and have ten or more of them call a Special Session.

■ While it is usual for the legislatures of the various states to divide their state into Congressional Districts, a legislature is under no compulsion to do so. The Constitution of the United States, Article I, Section 2, provides that "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, * * * " and "Representatives * * * shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, * * *."

While Section 4 of Article I says, "The Times, Places and Manner of holding Elections for * * * Representatives, shall be prescribed in each State by the Legislature thereof; * * *" this section does not provide for the division of a State having two or more Representatives, into Congressional Districts. It was pointed out in Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481, that choosing Representatives as a group on a state-wide basis, was "a widespread practice in the first 50 years of our Nation's history."

■ Thus, even if the present apportionment law, which was introduced in the 1961 Legislature as L.B. 195, and became law on May 10, 1961 without the signature of Governor Morrison (Chapter 5, Section 101, Reissue, Revised Statutes, Nebraska, 1943), is unconstitutional and void, plaintiff has no right to cause the division of the State into Congressional Districts and the Legislature is under no duty enforceable in the courts so to do.

■ For decades, the Congress of the United States provided in its apportionment acts for the election of Representatives to Congress by districts composed of a contiguous and compact territory, and containing as nearly as practicable an equal number of inhabitants. See Title 2, U.S.C.A. Sec. 3. This section expired by its own limitation upon enactment of the Reapportionment Act of June 18, 1929 and was not reinstated in subsequent reapportionment acts. See Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131.

The recent Conference Report agreed upon by the Senate and House Committees accompanying H.R. 2508 would have provided among other things for the election of Representatives by districts. The press reports the defeat of the Report in the United States Senate on November 8, 1967 after it had been approved by the House. Thus, there is presently no Act of the Congress that either requires or prohibits the division of a State into Congressional Districts.

■ As stated in Park v. Faubus, D.C., 238 F.Supp. 62 (1965) "The better practice may be to divide the State into districts." However, as indicated in *Park*, supra, even if plaintiff is correct as to the invalidity of the present law, which divides the State of Nebraska into three districts, defendants should only be restrained from conducting any future elections in accordance with the provisions of an invalid law. It would be improper for this court to order the Legislature to provide for election by districts in the absence of an Act of Congress so requiring, even if its members were parties to this case. Absent valid legislation providing for election by districts the people's right to elect at large remains.

We turn, therefore, to the question of whether the districts created under the 1961 Act are so unequal as to make the Act unconstitutional. The case was submitted upon a stipulation of facts, Exhibit 1, oral testimony relating to population estimates made annually by the Bureau of Business Research of the University of Nebraska, and certain exhibits which in the main were received without objection.

The population of the State of Nebraska as determined by the 1960 Census was 1,411,921. Nebraska is entitled by reason of that census to three Representatives. Thus, two districts, each

containing 470,640 inhabitants and one containing 470,641 inhabitants, would constitute mathematical exactness. Congressional districts numbered 1, 2 and 3, as created by the 1961 Act, contained 531,098, 404,695 and 476,128 people, respectively.

Thus, the ratio between the median district of 470,640 and the largest district is 1 to 1.128 and between the smallest and largest is 1 to 1.312. The ratio between the median district and the smallest district is 1 to .8598. Thus, the greatest deviation in districts, when created, was over 31%.

Exhibit 5 shows the population of the various counties in Nebraska, as shown both by the 1960 Census and by the Bureau of Business Research for December, 1966. We say dogmatically that even if county lines had been followed, three contiguous districts could have been formed which would have been much more nearly equal in population than those created. In fact, a difference between the largest and smallest of the three districts of less than 1% is easily and quickly obtainable following county lines and using the 1960 Census. Study might even have reduced the population difference of the three districts to less than 1000.

■ The law is clear. It was well stated in Wells and Harrington v. Rockefeller, et al. (S.D.N.Y.D.C.) 273 F.Supp. 984 (May 10, 1967):

"Since the broad principles established by Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), two rules applicable to congressional districts have emerged. First, substantial equality of population among districts in any state is required. Second, there is a burden on the proponent of any districting plan to justify deviations from equality.

"I. The first principle stems from Wesberry v. Sanders, 376 U.S. 1, 84 S. Ct. 526, 11 L.Ed.2d 481 (1964), namely, that the command of Art. I, § 2 of the United States Constitution 'means that as nearly as practicable one man's vote in a congressional election is to be worth as much as another's.' (p. 8, 84 S.Ct. p. 530). To achieve this purpose, the Supreme Court held that 'While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives.' (p. 18, 84 S.Ct. p. 535) Conversely, the Court was unwilling to hold that 'legislatures may draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others.' (p. 14, 84 S.Ct. p. 533).

\*　　\*　　\*　　\*　.　\*　　\*

"Although Swann v. Adams (Swann III), 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967) involved the redistricting of Florida's legislature, the opinion of the Court is applicable (actually *a fortiori)* to congressional districts. The deviations in districts in *Swann III* were substantial, 15% above average in one, 14% in five and more than 10% in six. To us, it seems highly significant that the Supreme Court did not renounce all considerations other than absolute mathematical equality. On the contrary, it specifically adverted to the justifiable variations from a pure population standard and mentioned as possible justifications 'integrity of political subdivisions, the maintenance of compactness and contiguity in legislative districts or the recognition of natural or historical boundary lines,' as set forth in Reynolds [v. Sims] 377 U.S. [553] at 579, 84 S.Ct. 1390, 1391. Such an interpretation of *Reynolds* was wholly consistent with a 'rule of reason' in reapportionment matters. The alternative would have been abject judicial surrender of jurisdiction to the mindless computer.

"The significance of *Swann III* in congressional district cases is disclosed in the Court's brief 'Per Curiam' (also January 9, 1967) in Duddleston v. Grills, 385 U.S. 455, 87 S.Ct. 611, 17

L.Ed.2d 508, wherein the Court vacated the lower court's approval of a redistricting plan (Indiana) and remanded the case 'for further consideration' in the light of *Swann III*, *Wesberry* and *Reynolds*. *Preisler II*, declaring Missouri's reapportionment unconstitutional, was affirmed, 385 U.S. 450, 87 S.Ct. 613, 17 L.Ed.2d 511. Thus, in summary, the Supreme Court's current views appear to be that the 'equal population principle' applies to congressional districts—unless—. The 'unless' gives rise to the second principle.

"II. The second principle is found in *Wesberry*, *Reynolds* and the January 9, 1967 decisions, and is that if there be any deviation from equality of population, the burden is on the State or other proponent to justify the deviation. In *Swann III*, the Court reversed 'for the failure of the State to present or the District Court to articulate acceptable reasons for the variations among the populations of the various legislative districts * * *.' There was 'no attempt to explain or justify the many variations * * *.' The Court cited with approval the statement in Maryland Citizens, [Committee for Fair Congressional Redistricting] supra, 253 F.Supp. [731] at 733, that there was no showing that the variation was 'unavoidable or justified upon any legally acceptable ground.' Thus, the Court does not close the door to disparity provided it be slight and provided it be justified on a 'legally acceptable ground.' "

The court in *Wells and Harrington*, supra, held the New York Congressional Redistricting law which had one district with a population of 15.1% above average and an adjoining district. 14.4% below average—"a spread between these two contiguous districts of 29.5%" and which had six districts over 10% above average and seven over 10% below average, was unconstitutional.

We agree with plaintiff that the burden is on the defendants to justify the deviation that existed under the 1961 Act.

The only attempt at justification is a feeble one, namely, that the 1961 Legislature expected the population in the Second District to increase.

Evidence was introduced by defendants to show that based on enumerated factors the Bureau of Business Research of the University of Nebraska estimated the December, 1966 population of the three districts as follows: Number One, 556,094; Number Two, 485,222 and Number Three, 474,728. Thus, District Number One is believed to have increased 4.7%; District Number Two 19.9%, and District Number Three has decreased 0.3% since the 1960 Census. See Exhibit 6.

Defendants argue that this supports the legislative viewpoint that the Second District would increase in population and contend that now the difference in population has been so reduced that reapportionment should await the 1970 Census.

Plaintiff objects to this evidence relative to these population estimates, saying that it is unreliable and questions the validity of the factors used by defendants' witnesses. While it is true that there is no perfect substitute for the decennial census, and the 1966 estimates, in the judgment of the professor in charge of the Bureau of Business Research, may be in error as much as 3%, the districts, even if we adopt defendants' testimony, show a variance from median of over 10% above and over 6% below and that the largest district is over 17% larger than the smallest.

Defendants' figures further show that the population variance between districts 1 and 3 has increased since the 1961 legislation was passed. If the Act contained a substantial inequality in 1961, the defendants have shown nothing more than the fact that a substantial inequality still persists today.

If the Legislature was to redistrict the State at its next session, we could not give approval to a plan with such variances. We see no good reason why we should by inaction approve continu-

608

ance of a plan that would be stricken down if the Legislature should offer it as providing substantial equality of population.

■ Congressional redistricting differs from legislative redistricting in an important aspect that should be mentioned here. Under Section 5 of Article III of the Nebraska Constitution, the Legislature may redistrict itself not more often than once in ten years. There is no such limitation on Congressional redistricting. It would appear from Exhibit 6 that the Legislature should consider and may need to change Congressional District boundaries at each legislative session if it determines upon a policy of redistricting as opposed to a policy of electing representatives at large.

■ This court believes these estimates of an impartial University department are proper for consideration by this court in determining the issues to be here decided and likewise that they would be helpful to the Legislature, if assembled in Special Session, to consider avoiding electing Representatives at Large. Such estimates would appear to have more validity than to use 1960 Census figures. However, the Legislature may find some other census or estimates even more reliable. We do not intend to say in this opinion that the Bureau of Business Research estimates are the best standard to use if redistricting is attempted. We are saying that better evidence of population in 1967 is available than the blind use of the 1960 Census. Cf. Meeks v. Avery, D.C., 251 F.Supp. 245. It is well stated in *Wells,* supra:

"It is not for this court to dictate to the Legislature the methods whereby substantial equality is to be attained. It may be suggested, however, that population statistics as of December 31, 1966, might well be capable of reasonable ascertainment from various sources to which the Legislature would have access. Such current figures should tend to reflect the radical population changes in the areas where such changes have occurred. * * * Even if perfection cannot be achieved between now and 1973, improvement is worth the effort."

It is clear that whether we take the 1960 Census, or the December, 1966 estimates introduced by defendants, that the three Congressional Districts now existing in Nebraska do not now provide and never have in the past provided substantial equality in population. It is clear that no sound or acceptable reason has been presented for the legislative failure to so provide substantial equality in population and that defendants have not met the burden on them to justify the deviations in equality which existed in 1961 when the law was passed and which continue to exist.

In the light of these deviations and the reluctance of the Legislature since 1961, to make a more equitable apportionment, we cannot subscribe to the argument of the defendants that following the 1970 Census the Legislature will properly reapportion. We therefore see no reason to postpone action until the 1970 Census is available.

■■ L.B. 195, passed by the 1961 Legislature, and now cited as Chapter 5, Section 101, Reissue, Revised Statutes, Nebraska, 1943, is unconstitutional and void and we so adjudicate it. We will not order the Governor to call a Special Session. He can do so if he desires. In any event, the Legislature can, if ten members so agree, convene a Special Session. If no action is taken to call a Special Session by either the Governor or the Legislature, or, if a Special Session is called, and a valid redistricting law is not passed, the 1968 Congressional election in Nebraska must be at large.

A separate order is this day being entered and the costs of this action will be taxed to the defendants.