**Roscoe DIXON et al., Plaintiffs,**

v.

**Shirley HASSLER, Coordinator of Elections, et al., Defendants.**

Civ. No. C–74–360.

United States District Court, W. D. Tennessee, W. D.

March 25, 1976.

Jerome M. Hoffman, Leonard V. Hughes, Jr., Hoffman, Dwyer, Hughes, McWhorter & Wener, Memphis, Tenn., for plaintiffs.

Alex B. Shipley, Jr., Asst. Atty. Gen., Nashville, Tenn., for defendants.

Lewis R. Donelson, III, Robert Walker, Heiskell, Donelson, Adams, Williams & Kirsch, Memphis, Tenn., for intervenor Shelby County Republican Party.

J. Houston Gordon, Covington, Tenn., for intervenor "Committee for the Preservation of the Seventh Congressional District".

Before PHILLIPS, Chief Circuit Judge, BROWN, Chief District Judge, and WELLFORD, District Judge.

---

BAILEY BROWN, Chief District Judge.

This action was filed on July 2, 1974 by plaintiffs, who are registered voters in the 6th, 7th and 8th Congressional Districts of Tennessee, against the state Coordinator of Elections and the Shelby County Election Commissioners. They alleged in substance that the Congressional reapportionment statute, based upon the 1970 Federal census, enacted by the Tennessee legislature on April 13, 1972 (T.C.A. § 2–1603), had brought about an unconstitutional malapportionment of those Districts. More particularly, they alleged that prior to the enactment of this 1972 statute, the Shelby County Election Commission had created some new precincts, with the result that, under the statute, the population in the area covered by some of these new precincts was assigned to the 8th District rather than, as was intended by the legislature, to the 6th and 7th Districts. Thus, it was alleged, the 8th District as so constituted by the statute had a substantially greater population than the 6th and 7th Districts.[1] Plaintiffs still further alleged that the assignment of these newly created precincts to the 8th District (that were intended to be in the 6th District) created a "pocket" of the 8th that was surrounded by the 6th District.

Plaintiffs took the position, in their complaint, that the creation of these new precincts and the assignment of them to the 8th District amounted to an unconstitutional application of the 1972 reapportionment statute by the Shelby County Election Commission and that, to correct the resulting malapportionment, the statute should be construed by this court, contrary to its plain terms, to place these newly created precincts in the 6th and 7th Districts as was actually intended by the Legislature.

Plaintiffs sought declaratory and injunctive relief prior to the primary election to take place on August 1, 1974 and to the general election to take place on November 5, 1974, and they demanded a three-judge court to hear this action.

One judge (Judge Brown) held a hearing on an application for a temporary restraining order, which was denied by memorandum and order entered on July 12, 1974.

A three-judge court was convened and held a hearing on plaintiffs' application for a preliminary injunction on July 26, 1974. At the inception of such hearing, the court announced that, due to the short time involved, it would not consider granting a preliminary injunction vis-a-vis the primary election to take place on August 1, 1974. The court then heard argument on other issues, including the issue whether this was a case that could properly be heard by a three-judge court. In an opinion filed on August 7, 1974, the court concluded that, since plaintiffs were not contending that the involved reapportionment statute was unconstitutional on its face but rather were contending only that it was being unconstitutionally applied, this case could not properly be heard by a three-judge court.

---

1. Under § 2–1603, certain entire counties were assigned to the 6th and 7th Districts. Because of the large population of Shelby County, which includes Memphis and its suburbs, in order to bring about a proper apportionment it was necessary for the legislature to assign part of its wards and precincts to the 6th District, to assign part of them to the 7th District, and to assign the remainder of its wards and precincts to the 8th District. Thus, under this reapportionment statute, the 8th District was made up only of wards and precincts in Shelby County not specifically assigned by number to the 6th and 7th Districts. This meant that new precincts that were carved out of precincts assigned by their number to the 6th and 7th Districts (and as new precincts received a new number) were by the statute assigned to the 8th District rather than to the 6th or 7th District. One new precinct was so assigned to the 7th and four were so assigned to the 6th District.

Prior to the filing of such opinion on August 7, 1974, the plaintiffs filed an amended complaint alternatively contending that, in view of the populations of these Districts as the Districts are established by the 1972 reapportionment statute, the statute is unconstitutional on its face. The court then held a hearing on the amended complaint on September 24, 1974. At such hearing the parties stipulated that the 6th, 7th and 8th Congressional Districts, as established by the involved 1972 reapportionment statute, had, according to the 1970 Federal census as interpolated by the Memphis and Shelby County Planning Commission, the following populations: 6th District, 473,060; 7th District, 487,583; and 8th District, 510,031.[2] Following such hearing, the court filed an opinion on October 29, 1974, ruling that it would issue no order affecting the general election to take place on November 5, 1974. The principal reason stated for such ruling was that the primary elections had already been held in the Districts as then constituted, and the nominees of the respective parties had been campaigning for election in the Districts as then constituted. The reapportionment sought by the plaintiffs was taken under advisement for a later ruling.

Thus, although plaintiffs had shown, at least presumptively, that, according to the 1970 Federal census, the 6th and 8th Districts were clearly malapportioned by the 1972 reapportionment statute, this court, for the reasons stated, granted them no relief with respect to the August 1, 1974 primary election and the November 5, 1974 general election.

On December 26, 1974 the court filed another opinion in which it ruled that,

based upon the 1970 Federal census figures, the 6th and 8th Congressional Districts were malapportioned. We pointed out that, according to such figures, the stipulated average population of all the Tennessee Congressional Districts was 490,615, that the stipulated population of the 6th District was 17,555 less than the average, and that the stipulated population of the 8th District was 22,093 more than the average.[3] We further pointed out that such stipulated population of the 7th District was only 3,432 less than the average and made no ruling as to whether the 7th District was malapportioned. The court referred to the fact, in its opinion, that the Tennessee legislature would be meeting in January, 1975, and concluded that, since apportionment is primarily a legislative task, the court would defer any action in order to give the legislature the opportunity to correct the malapportionment of the 6th and 8th Districts. We also invited the legislature to consider whether the 7th District was also malapportioned. And we pointed out, in the opinion, that the legislature was free to investigate and to consider the relative current populations of these Districts in devising a reapportionment plan.

The Tennessee legislature, during its session beginning in January, 1975, did consider reapportionment. The House of Representatives actually passed a bill (House Bill 1100) which reapportioned the 6th, 7th and 8th Districts as would have been done by the 1972 statute had the new precincts, heretofore referred to, not been created prior to the enactment of that statute. However, this proposal was defeated in the state Senate (Senate Bill 734) and therefore no

2. Such interpolation is necessary because Shelby County is divided between the three Districts and because census tracts are not congruent with precincts.

3. The incumbent Congressman in the 8th District, who had intervened, took the position that such figures were not the best evidence of the current populations of the 6th and 8th Districts and that the Districts actually were not malapportioned. He filed the depositions of

the executive director of the Shelby County Election Commission and the principal planner of the Shelby County Planning Commission in support of this contention. However, in our December 26, 1974 opinion, we held that such stipulated 1970 census figures were the best evidence before the court of the populations of the Districts. This intervening party has since withdrawn from the litigation.

reapportionment was enacted by the legislature.[4]

On July 18, 1975, the plaintiffs filed a motion for relief, alleging that the Tennessee legislature had failed to reapportion and proposing that this court reapportion these Districts in accordance with House Bill 1100 that had failed to pass the Senate. On September 29, 1975, certain registered voters of the 7th District (as the "Committee for the Preservation of the Seventh Congressional District") intervened and joined with plaintiffs in proposing to the court that these Districts be reapportioned in accordance with House Bill 1100.[5] On October 1, 1975, the defendants filed a response to plaintiffs' motion for relief, in which they proposed that the Districts be reapportioned as the 1972 statute would have done but for the creation of the aforementioned new precincts prior to the enactment of such statute. This proposal is in essence the same as that of the plaintiffs and the Committee for the Preservation of the Seventh Congressional District. Thus, at this point, all parties were in agreement as to the reapportionment that should be decreed by this court.

On October 22, 1975, the Shelby County Republican Party intervened. In its petition, it alleged that the Bureau of Census of the Department of Commerce had, on March 21, 1975, published estimates (a copy of such "provisional estimates" and explanation thereof was exhibited) showing current populations of these Congressional Districts as of July 1, 1974 as follows: 6th District, 518,000; 7th District, 520,000; 8th District, 504,000. It was pointed out that, according to these publications, these estimates are reasonably accurate. It appears that these estimates are in substantial part based upon estimates made by the National Planning Data Corporation, and attached to

the petition to intervene is an explanation of the technique used by that organization in making its estimates. Also exhibited to the petition are Bureau of Census estimates as to the census tracts in Shelby County and a division of such estimates between these Congressional Districts; and likewise exhibited was a 1973 report of a special census in the Raleigh area in the 7th District.

The petition of the Shelby County Republican Party then proposed, based upon the estimates, to reapportion the 6th, 7th and 8th Districts, which would have the effect of increasing the population of the 8th District and decreasing the population of the 6th and 7th Districts.

On October 29, 1975, plaintiffs filed a response to the petition of the Shelby County Republican Party in which they alleged, in substance, that the estimates were not sufficiently accurate for reapportionment purposes and that, in any event, as a matter of law this court was confined to a consideration of the 1970 Federal census figures. The court therefore required memoranda from the parties on the question whether the court could consider other than the 1970 Federal census figures. All parties except the Shelby County Republican Party took the position that as a matter of law the court could consider only the 1970 census figures. The Shelby County Republican Party, in addition to contending again that this court could and should reapportion in line with the population estimates, also suggested in its memorandum that the court might take no action on the ground that the malapportionment about which plaintiffs complained had more than corrected itself.

On December 31, 1975, a pretrial conference was held at which counsel were advised that the court had not decided wheth-

---

4. While we do not believe that the motivation of the legislators with respect to their action or inaction in 1972 and 1975 is relevant here, there is nothing in this record to show that the political implications of this reapportionment was not a consideration.

5. Under House Bill 1100, only one precinct would be moved from the 8th to the 7th District.

er, as a legal proposition, it could consider the population estimates that had been tendered and counsel were advised that a hearing would be held by the court on the factual validity of such estimates as well as on the legal question whether such estimates could be considered. The parties agreed that the proof in support of the validity of the population estimates and the proof attacking their validity would be submitted by deposition.[6] Accordingly, the Shelby County Republican Party took and filed the deposition of Peter K. Francese of the National Planning Data Corporation and the other parties took and filed the deposition of Donald E. Pursell, who is a labor economist and demographer on the faculty of Memphis State University. A hearing was then held on January 26, 1976, at which the factual validity, based upon the record before us, of the population estimates was argued, and also argued was the legal question whether in any event the court could consider such population estimates. Both questions were taken under advisement.

We have reached the conclusion that, in making this reapportionment ruling, this court is not confined as a matter of law to the 1970 Federal census figures and that we may consider the estimates tendered by the Shelby County Republican Party. *Kirkpatrick v. Preisler,* 394 U.S. 526 at 535, 89 S.Ct. 1225 at 1231, 22 L.Ed.2d 519 at 527 (1969) and the concurring opinion at 537, 89 S.Ct. at 1232, 22 L.Ed.2d at 528, so indicate.[7]

Although we have determined that this court may consider the population estimates, before considering the validity of such estimates as compared with the 1970 Federal census figures, we must first determine, as a legal proposition, the strength that the evidence supporting the estimates must have in order to overcome the presumptive correctness of the "head count" upon which the 1970 Federal census was based. *Exon v. Tiemann,* 279 F.Supp. 603 (D.Neb.1967), while holding that estimates may be considered, does not really deal with this question. *Kirkpatrick, supra,* at 535, 89 S.Ct. at 1231, 22 L.Ed.2d at 528, indicates that the estimates must have a "high degree of accuracy" if they are to overcome the presumptive correctness of the prior decennial census. While it is difficult to express such propositions in quantitative-qualitative terms, we believe that the standard to be applied is that the decennial census figures will be controlling unless there is "clear, cogent and convincing evidence" that they are no longer valid and that other figures are valid. This is a test that lawyers are familiar with and are accustomed to dealing with.

It has been suggested that perhaps a lesser standard should be applicable insofar as it is contended (as it is alternatively contended by the Shelby County Republican Party) that no action should be taken because the population estimates show that the malapportionment has more than corrected itself. In other words, it is suggested, even if the proof in support of the population estimates is not strong enough to support a new reapportionment, it is strong enough to require that no action be taken. However, in *Kirkpatrick, supra,* the Supreme Court said at 535, 89 S.Ct. at 1231, 22 L.Ed.2d at 527: "Findings as to population trends must be thoroughly documented <u>and applied throughout the State in a systematic, not an ad hoc, manner.</u>" (Underlining ours.) Thus it would appear that we could not properly confine the effect of our ruling, if it were based on these population estimates, to these Districts alone.[8] More-

---

6. A pretrial order setting out the results of the conference was entered the same day.

7. By so ruling, we do not mean to say that, if these Districts had been constitutionally apportioned following the 1970 census, they could be reapportioned based on population changes prior to the 1980 Federal census.

8. The Shelby County Republican Party concedes that if this court reapportioned these Districts based upon these population estimates, it would also have to reapportion any of the other Districts in this state that are, according to these population estimates, malapportioned.

over, to adopt a rule that would so allow the population estimates submitted here to be a proper basis for not correcting the malapportionment brought about by this 1972 statute would be to invite legislative bodies not to shoulder their reapportionment burdens after the decennial census on the ground that some evidence might later develop that the malapportionment had corrected itself.

We turn now to consider the evidence to support the correctness of the "provisional estimates" of populations issued by the Bureau of Census on March 21, 1975, effective as of July 1, 1974. As stated, in support of the validity of such estimates the Shelby County Republican Party filed the deposition of Peter K. Francese of the National Planning Data Corporation and, in support of their invalidity, the other parties filed the deposition of Donald E. Pursell of Memphis State University.

Mr. Francese testified that the Bureau of Census purchases the estimates prepared by the National Planning Data Corporation but does not vouch for their validity, although they are very accurate. He further testified that the the Bureau make its own estimates without reliance on National Planning estimates except where there are boundary problems as there are in the instant case in Shelby County. (There is no testimony in the record from a representative of the Bureau of Census.) Mr. Francese stated that National Planning considers four factors in arriving at an estimate: the change in population of the census tract between the 1960 census and the 1970 census; the population density and land area of the tract; the 1970 census data on the tract as to housing type (rental, owned, single family, etc.), housing value, income and age of people, and family structure; and current information on the tract with respect to listed telephones and registered automobiles. Mr. Francese testified that the listed telephone and registered automobile information is purchased from another concern, is proprietary to that concern, and could not be produced for examination. Mr. Francese stated that he could not say whether, in urban areas, black population densities were greater than white population densities. He could not say for sure whether, in applying the four factors above referred to, his firm considered what percentage of the census tract was occupied by blacks and by whites. Mr. Francese testified that his firm applies an equation to the relevant factors with respect to each tract in coming up with an estimate, but that the equation was proprietary to his firm and could not be revealed.

We conclude that, without discussing at length the testimony of Donald E. Pursell, offered by the opposing parties, the Shelby County Republican Party has not presented clear, cogent and convincing proof that the 1970 Federal census figures are not the best evidence of the current populations of these Districts and that the "provisional estimates" of the Bureau of Census are the best evidence of such populations. However, we would point out that, according to Pursell, there is no way to test the validity of National Planning's estimates without knowing the equation used because, without the equation, one does not know the weight that was given to the variables.

Since the 1970 Federal census figures are, we hold, controlling as to these reapportionment claims and since we have already held (on December 26, 1974) that, in accordance with such figures, the 6th and 8th Districts are malapportioned, this court will enter a decree reapportioning the 6th and 8th Districts.

With respect to the 7th District, this court did not, as stated, hold such District to be malapportioned in our December 26, 1974, opinion and expressly left the question open. We have concluded that it, too, is malapportioned. While the population of the 7th District is, according to the 1970 census, only 3,432 less than the average of the Districts in this state, *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1963), requires that, as nearly as practicable, the populations of the Districts be made equal. Here it is quite practicable, as

plaintiffs urge, to move to the 7th District one precinct which was assigned to the 8th rather than the 7th District because it was carved out of a 7th District precinct prior to the adoption of the 1972 statute. Moreover, such action would then make the Wolf River the boundary in this area between the 7th and 8th Districts. Indeed, the Committee to Preserve the Seventh Congressional District, intervenor, has supported this action.

As stated, the state Coordinator of Elections and Shelby County Election Commissioners propose that we reapportion these three Districts in accordance with the 1972 statute (T.C.A. § 2–1603) as the wards and precincts were constituted prior to the changes. More precisely, they propose to reapportion in accordance with T.C.A. § 2–1603 (Chap. 733 of the Public Acts of 1972) but with the wards and precincts as they were established at the time of the introduction of House Bill 1254 in 1971.[9] As also stated, in proposing that this court reapportion in accordance with House Bill 1100 that passed the House of Representatives in 1975 but was defeated in the state Senate, plaintiffs and the Committee to Preserve the Seventh Congressional District are proposing the same reapportionment.

The record shows that a reapportionment in accordance with these proposals will abolish the "pocket" where a part of the 8th District is surrounded by the 6th,[10] will, as stated, create a natural boundary of the Wolf River between the 7th and 8th Districts, and will make the populations of the three Districts, according to the 1970 census, almost equal. That is, the population of the 6th District will be 490,261, of the 7th District will be 488,864, and of the 8th District will be 491,549.[11]

A decree reapportioning these Districts as herein indicated will be entered.

9. House Bill 1254 became TCA § 2–1603.

10. Actually, the "pocket" of the 8th District surrounded by the 6th District in turn surrounds one precinct of the 6th District. Thus there is a "pocket" within a "pocket."

APPENDIX

As stated in the opinion, the populations of the three Districts according to the interpolated 1970 Federal census is:

| | |
|---|---|
| 6th District | 473,060 |
| 7th District | 487,583 |
| 8th District | 510,031 |

In April, 1971, ward and precincts 73–1 and 73–2 (in the 6th District) were divided into 73–1, 73–2 and 73–3, the last being assigned by the 1972 statute to the 8th District. (73–3 has since been subdivided, but all precincts created therefrom have remained in the 8th District.) 73–3 has a population of 8609.

In April, 1971, ward and precincts 74–1 and 74–2 (in the 6th District) were divided into 74–1, 74–2, 74–3 and 74–4, the last two being assigned by the 1972 statute to the 8th District. In January, 1972, ward and precinct 74–2 (in the 6th District) was divided again into 74–2 and 74–5, the last being assigned to the 8th District. 74–3, 74–4, and 74–5 have a population of 8592.

The combined populations of these new precincts that were carved out of 6th District precincts and assigned by the 1972 statute to the 8th District is 17,201.

In January, 1972, ward and precinct 72–2 (in the 7th District) was divided into 72–2 and 72–4, the latter being assigned to the 8th District. 72–4 has a population of 1281.

Accordingly, if the combined populations in 73–3, 74–3, and 74–4, as such precincts were established in April, 1971, and the population of 74–5, as such precinct was established in January, 1972, (17,201), are subtracted from the 8th District and added to the 6th District, and if the population of 72–4, as such precinct was established in January, 1972, (1281), is subtracted from the 8th District and added to the 7th Dis-

11. An appendix hereto explains how such reapportionment will bring about this result. All figures in the appendix are based on the 1970 Federal census as interpolated.

trict, the populations of the Districts will be as follows:

| | |
|---|---|
| 6th District | 490,261 |
| 7th District | 488,864 |
| 8th District | 491.549 |

PHILLIPS, Chief Circuit Judge (concurring).

I concur in the results in the opinion prepared by Judge Brown and in all parts of that opinion with one exception. I would hold that, as a matter of law, we are bound by the 1970 "head count" of the federal census figures and should not consider estimated population shifts that may have occurred since that time. In determining the population of the voting precincts of Shelby County here in question, we should accept the best available population interpolations with respect to the 1970 census, and not changes that are estimated to have taken place since the taking of that census.

I was one of the members of the three-judge district court which decided *Baker v. Ellington*, 273 F.Supp. 174 (M.D.Tenn.1967), in which all Tennessee Congressional Districts were reapportioned. This was done on the basis of the 1960 federal census, and not on the estimated population shifts that had occurred during the ensuing seven years.

I agree with the opinion of Judge Brown that the estimated population shifts relied upon in the present case are not established by "clear, cogent and convincing evidence." Nevertheless, even if the evidence of population shifts should be sufficient to meet this high standard, I do not see how we could make changes (or decline to make changes, as suggested in the dissenting opinion), without bringing into question the correctness of the population of the other Congressional Districts of the State, and of the population of the remaining portions of the Sixth, Seventh and Eighth Congression-al Districts, all of which are based upon the 1970 federal census.

WELLFORD, District Judge (dissenting).

I respectfully dissent from the majority opinion, because census estimates supported by other clear and objective data convince me that this Court should not in 1976 act on the basis of interpolated 1970 figures. The 1970 U.S. Census figures utilized by the Court as a basis for its decision were founded upon Memphis & Shelby County Planning Commission interpolations of 1970 census population figures from census tracts which were not co-extensive with wards and precincts located within the Sixth, Seventh, and Eighth Congressional Districts within Shelby County, Tennessee. Upon this stipulated 1970 information as to the population of these three Districts—473,060, 487,583 and 510,031, respectively, it was ruled that malapportionment existed in the Sixth and Eighth[1] Congressional Districts, but action was deferred pending an opportunity for the 1975 Tennessee legislature to study, investigate and act, as appropriate, with respect to any necessary re-apportionment.

The particular circumstances pertaining to the division of Shelby County into three Congressional Districts had been the subject of considerable legislative scrutiny in 1972 when the impact of ward and precinct designation became apparent within the largest County in the State. No action was taken; subsequently this suit was then instituted by several citizens seeking to bring about by judicial action what the Tennessee legislature had declined to undertake.

Although the matter was called to the attention of the Tennessee legislature, no action was taken by that body during the 1975 sessions to effectuate any change in the Sixth, Seventh or Eighth Congressional Districts.[2] Plaintiffs, by new counsel,

---

1. Located entirely within the City of Memphis.

2. A bill to change the composition of these Districts passed the Tennessee House, but failed to pass in the State Senate by a bipartisan vote of the Senators from the affected area of West Tennessee (two of the Democrat ma-jority Senators cast a "no" vote from the Sixth Congressional District, representing the 22nd and 23rd State Senate Districts). The one independent Senator in the Senate was recorded as not present (see vote tabulation appended as Table 1).

moved for supplementary relief in accordance with the bill which failed in the State Senate, but received House approval. Intervenors, one group of residents of the Seventh Congressional District, sought essentially to preserve its present make-up; another, the Shelby County Republican Party, opposed the proposal of redistricting and set forth its own plan premised on further population data after 1970.

All of the parties agree on one principal issue—that if any adjustments were to be made there should be a transfer of certain wards and precincts within Shelby County only, not any shift of Counties within the present Districts which are situated in the western portion of the State. The State legislature may consider the most reliable indicator of population in arriving at a decision respecting apportionment or reapportionment of Congressional Districts. *Exon v. Tiemann,* 279 F.Supp. 603, 608 (D.Neb. 1967; 3 Judge Court); *Meeks v. Avery,* 251 F.Supp. 245 (D.Kan.1966; 3 Judge Court); *Gong v. Kirk,* 278 F.Supp. 133 (S.D.Fla. 1967; 3 Judge Court); *Aff'd.,* 389 U.S. 574, 88 S.Ct. 695, 19 L.Ed.2d 784 (1968); *Wells v. Rockefeller,* 273 F.Supp. 984 (S.D.N.Y.1967; 3 Judge Court).[3] It may be presumed that the Tennessee legislature considered later data concerning population of the Districts in question during its 1975 Session, subsequent to 1970 census data. Prior to the vote in the Senate, the United States Census Bureau issued new estimates of the population of Congressional Districts in the United States (Dept. of Commerce News, CB 75–64, 3/21/75) which showed estimates for July 1, 1974, of the Districts to be:

| | |
|---|---|
| Sixth | 518,000 |
| Seventh | 520,000 |
| Eighth | 504,000 |

The average population of the eight Congressional Districts in Tennessee was 516,-125 according to this census estimate. In June of 1975, by a publication of the Department of Commerce, Bureau of the Census (Series P–25, No. 587) the 1973 estimates for Counties and populated places in Tennessee was explained in detail. It was found that comparisons of the administrative determinations with federal-state co-op estimates[4] were favorable and the "level of accuracy suggested by these averages is quite good," and, in summary, "yields results that compare favorably with existing methods and provides acceptable estimates, systematically, in geographic detail on a current basis not available from any other known source (short of a full-scale census)." Furthermore, it was concluded that "the level of accuracy of the estimates implied by the test results would appear to be acceptable for most uses where current population figures are required. It is in line with the quality level recommended or proposed for a variety of legislature purposes." The difference between administrative records estimates and co-op estimates, according to this report, was less than 3% in Counties with population between 10,000 and 25,000; and less than 2½% in Counties with more than 25,000 population (see Table 3). Indeed, the average percent difference between the population estimates using administrative records-based data and actual census counts in 1970 was less than 2%. (Comparing entire Counties alone showed a 1.3% difference). According to 1973 estimates, a June, 1975, census publication showed tremendous growth percentage-wise in suburban towns in Shelby County located in the Sixth Congressional District; Germantown 65% from 1970 to 1973[5]; and Collierville 31% during the same period. According to these same estimates, the City of Memphis (mostly comprising the Eighth District) grew a modest five per cent during this three year period (comparable generally to eight towns in agrarian Seventh

3. *Affirmed,* 389 U.S. 421, 88 S.Ct. 578, 19 L.Ed.2d 651 (1967).

4. Co-op estimates are those of the Census Bureau's Federal-State cooperative program for local population estimates.

5. Professor Pursell complained that a 1974 special census showed a much larger growth in Germantown than the 1973 estimate indicated, even taking into account a substantial annexation in January, 1974.

District Tipton County). These various comparisons, however, demonstrated a general supportive accuracy of these official census estimates of 1973 and 1974.

Courts may also take into consideration orderly, objective and accurate records beyond the decennial census figures where substantial population shifts have been reflected. *Calkins v. Hare,* 228 F.Supp. 824 (E.D.Mich.1964); *Kirkpatrick v. Preisler,* 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). Table 3 appended reflects that outside Shelby County, the population of the 19 Counties making up the Sixth Congressional District grew by an estimated 40,000 from 1970 to July 1, 1974. During this same period, the population growth outside Shelby County of the fourteen Seventh District Counties was only an estimated 16,500. Shelby County Election Commission figures show a steady and consistent growth of registered voters in Shelby County from 1970 through 1975 in the Sixth Congressional District towns in Shelby County, reflecting the large over-all increase in that Congressional District (see Table 4 appended). A comparison of registered voters in Shelby County from 1972 through 1975 shows a comparative shift from the Eighth Congressional District portion to the Sixth Congressional District further buttressing the estimates discussed (see Table 5 appended).

The census estimates as of July 1, 1974, for the three Congressional Districts within Shelby County reflect 89,800 for the Sixth; 141,100 for the Seventh; and 504,000 for the Eighth (see Tables 3 and 6). Thus, the 1974 census estimates would show approximately 12% of the Shelby County population to be in the Sixth Congressional District, approximately 19% in the Seventh, and nearly 69% in the Eighth. At the same time, the percentage of registered voters and actual voters within Shelby County during 1974 and 1975 was about 15% in the Sixth Congressional District and in the Seventh Congressional District (see Tables 5

and 7). This would clearly tend to indicate that the population of the Sixth Congressional District in 1974 (and 1975) exceeded that of the Seventh and Eighth Districts, particularly when it is taken into consideration that the "growth" Counties from 1970 to 1974 were virtually all located in suburban Shelby (outside the City of Memphis) and those Counties surrounding Nashville and Davidson County.[6]

Most cities in the United States lost population during the 1960–1970 era, except for gains in the suburban surrounding areas by way of annexation. The 1960 City Limits of Memphis, for example, contained, according to the census, 497,524 persons. That same area had, according to the 1970 census, only 486,968 persons. Growth of 136,562 occurred through annexation into some areas of the Sixth and Seventh Congressional Districts as constituted in 1970. (Statistical Abstract, U. S. Census, Tenn., Vol. 1, Part A, Sec. 2, Table 44–14). The National Planning Data Corp. (NPDC) by contract with the Census Bureau assisted in census tract estimates in 1974 and 1975 with regard to the division of Congressional Districts in Shelby County. The estimate of this company, engaged in statistical studies, showed approximately 510,000 population in the Eighth Congressional District, some 1% more than the census estimate itself. While that corporation's representative, Mr. Francese, testified as an expert called by the Shelby County Republican Party Intervenor, the Court was not persuaded by his independent testimony and analysis of the accuracy of his 1974–1975 estimates. It was strongly suggested, for example, that NPDC underestimated the Germantown population for that period by Professor Pursell, an expert hired by plaintiffs. To some considerable degree, however, these NPDC estimates, supported by census administrative estimates and federal-state co-op efforts, as well as special census data taken since 1970, indicate clearly

---

**6.** Williamson, Dickson and Montgomery Counties grew more than any other Counties (except Lewis) all in the Sixth Congressional District.

This has been a continuing pattern since the 1960 census. (See Table 8 appended).

the growth of the Sixth Congressional District population relative to the Eighth District since 1970. The Seventh District has been demonstrated to have grown less since 1970, both within and without the Shelby County portion of that District. Professor Pursell, moreover, testified that Shelby County was losing and had lost black population by net migration at the rate of 7% or 8% per decade since 1960. Most of the black population in Shelby County lives within the City of Memphis, particularly the Eighth Congressional District. These references are supportive of the substantial accuracy of the Congressional District estimates made by the Census Bureau in 1974, particularly with regard to a stagnant, even a slackening, population since 1970 of the Eighth District inside the city limits of Memphis.

The population trends discussed are satisfactorily documented and supported throughout West Tennessee to indicate reasonably and accurately substantially equal populations between the Sixth and Seventh Congressional Districts at the present time. The Eighth Congressional District is reliably estimated to be the smaller of the three. It would, therefore, be inappropriate and inequitable under the circumstances to force reapportionment as sought by plaintiffs, particularly in the face of legislative unwillingness to act in reference to subsequent demonstrated population adjustment.

I would, accordingly, decline to order a re-districting under the particular and peculiar circumstances here related. To follow plaintiffs' suggestion, in my judgment, would be to aggravate further the indicated present imbalance between the three Congressional Districts involved. I would agree, however, that under normal circumstances the ordinary basis for apportionment would be decennial census figures, which are doubtless the most reliable and accurate basis for congressional apportionment as required by the Constitution and the law. See *Kirkpatrick v. Preisler, supra.*

I find and conclude that the circumstances and data alluded are so convincing that this Court should decline to grant any of the parties relief requested; instead, the present ward and precinct make-up of Shelby County should be retained as to the Sixth, Seventh and Eighth Congressional Districts.

SENATE BILL No. 734 TABLE 1

| DISTRICT | SENATOR: CITY | PARTY | VOTE |
|----------|---------------|-------|------|
| 17 | Blank: COLUMBIA | (D) | AYE |
| 22 | Harvill: CLARKSVILLE | (D) | NO |
| 23 | Sullivan: DICKSON | (D) | NO |
| 24 | Hamilton: UNION CITY | (D) | AYE |
| 25 | Thomas: JACKSON | (D) | AYE |
| 26 | Wilder: SOMERVILLE | (D) | AYE |
| 27 | Davis: COVINGTON | (I) | * |
| 28 | Gillock: MEMPHIS | (D) | AYE |
| 29 | Ford: MEMPHIS | (D) | AYE |
| 30 | White: MEMPHIS | (D) | AYE |
| 31 | Person: MEMPHIS | (R) | NO |
| 32 | Dunavant: MILLINGTON | (R) | NO |
| 33 | Talarico: MEMPHIS | (D) | AYE |

*— NOT PRESENT

TABLE 2

Prepared By
The Staff of The
Tennessee
Legislative Council Committee
5/3/72
300c

Legislative Council Committee
State of Tennessee

TENNESSEE CONGRESSIONAL DISTRICTS

Chapter 733, Public Acts of 1972

Figures represent the total county populations as of the 1970 Census.

POPULATION OF CONGRESSIONAL DISTRICTS

| Congressional District | Population |
| --- | --- |
| First | 490,518 |
| Second | 492,539 |
| Third | 486,363 |
| Fourth | 492,124 |
| Fifth | 490,178 |
| Sixth | 489,361 |
| Seventh | 488,984 |
| Eighth | 494,097 |
| TOTAL | 3,924,164 |
| 1970 Federal Census | 3,924,164 |

| | |
| --- | --- |
| Average District | 490,521 |
| Largest District (Eighth) | 494,097 |
| Smallest District (Third) | 486,363 |
| Greatest Plus Variance | +3,576 |
| Greatest Minus Variance | -4,158 |
| Total Variance from Largest to Smallest | 7,734 |
| Percent of Greatest Plus Variance | +0.729% |
| Percent of Greatest Minus Variance | -0.848% |
| Total Percent of Variance from Largest to Smallest | 1.577% |

 

TABLE 3

COUNTIES IN 6TH, 7TH, 8TH CONGRESSIONAL DISTRICTS
UNDER TENN. CODE ANN. § 2-502, AS AMENDED IN
TENN. PUB. ACTS OF 1972, CH. 733

| SIXTH: | APRIL 1, 1970 CENSUS: | JULY 1, 1973 ESTIMATE: | JULY 1, 1974 ESTIMATE: | CHANGE 1970-1974 %: |
|---|---|---|---|---|
| Chester | 9,927 | 10,500 | 10,800 | 9.0 |
| Decatur | 9,457 | 9,600 | 9,600 | 1.9 |
| Dickson | 21,977 | 24,700 | 25,900 | 17.8 |
| Fayette | 22,692 | 22,800 | 25,700 | 13.2 |
| Giles | 22,138 | 22,500 | 22,900 | 3.2 |
| Hardeman | 22,435 | 22,300 | 22,500 | 0.2 |
| Hardin | 18,212 | 19,200 | 18,500 | 1.6 |
| Henderson | 17,360 | 18,700 | 19,200 | 10.7 |
| Hickman | 12,096 | 13,100 | 13,200 | 9.5 |
| Houston | 5,853 | 6,200 | 6,100 | 4.3 |
| Humphreys | 13,560 | 14,500 | 14,700 | 8.6 |
| Lawrence | 29,097 | 30,800 | 32,000 | 10.1 |
| Lewis | 6,761 | 7,700 | 7,900 | 16.4 |
| McNairy | 18,369 | 20,000 | 19,900 | 8.5 |
| Maury | 44,028 | 44,800 | 45,500 | 3.3 |
| Montgomery | 62,721 | 69,700 | 71,700 | 14.3 |
| Perry | 5,238 | 5,700 | 5,700 | 9.1 |
| Wayne | 12,365 | 12,900 | 13,100 | 5.7 |
| Williamson | 34,423 | 40,900 | 43,300 | 25.6 |
| *Shelby | (722,111) | (732,300) | (724,600) | (0.3) |
| TOTAL (EXCLUDING SHELBY) | 388,709 | 416,600 | 428,200 | |

| SEVENTH: | APRIL 1, 1970 CENSUS | JULY 1, 1973 ESTIMATE: | JULY 1, 1974 ESTIMATE: | CHANGE 1970-1974 %: |
|---|---|---|---|---|
| Benton | 12,126 | 12,400 | 12,100 | 0.1 |
| Carroll | 25,741 | 26,300 | 26,600 | 3.3 |
| Crockett | 14,402 | 14,700 | 14,800 | 2.6 |
| Dyer | 30,427 | 31,900 | 32,300 | 6.2 |
| Gibson | 47,871 | 48,500 | 47,700 | -0.3 |
| Haywood | 19,596 | 20,500 | 20,700 | 5.8 |
| Henry | 23,749 | 25,200 | 26,100 | 9.9 |
| Lake | 8,074 | 7,900 | 7,700 | -4.7 |
| Lauderdale | 20,271 | 21,300 | 21,300 | 5.2 |
| Madison | 65,774 | 69,800 | 69,300 | 5.4 |
| Obion | 30,247 | 32,100 | 32,100 | 6.0 |
| Stewart | 7,319 | 7,900 | 8,100 | 10.5 |
| Tipton | 28,001 | 28,900 | 29,900 | 6.9 |
| Weakley | 28,827 | 30,700 | 30,200 | 4.6 |
| *Shelby | (722,111) | (732,300) | (724,600) | (0.3) |
| TOTAL (EXCLUDING SHELBY) | 362,425 | 378,100 | 378,900 | |

NOTE: Estimates of U. S. Census Bureau and Tennessee State Planning
Office

TABLE 4

NUMBER OF REGISTERED VOTERS
6TH DISTRICT TOWNS IN SHELBY COUNTY

| | 1970: | 1972: | 1974: | 1975: |
|--------------|-------|-------|-------|-------|
| Capleville | 533 | 672 | 1464 | 1675 |
| Collierville | 1523 | 1839 | 2150 | 2666 |
| Forest Hill | 425 | 517 | 534 | 559 |
| Germantown | 1829 | 2785 | 5286 | 5912 |
| Ross Store | 381 | 418 | 471 | 635 |
| | 4691 | 6231 | 9905 | 11,447 |

(From Shelby County Election Commission)

NOTE: According to U. S. Census Bureau population estimates, in July, 1973, Collierville had a population of 4785 and Germantown a population of 5737. This reflected a three year growth from 3651 and 3474, respectively, from 1970 census figures*, a composite 47% growth. Bartlett and Raleigh had comparable growth in the same period within the Seventh Congressional District area of Shelby County.

*the census figures do not coincide with the 1970 population interpolations from census data as to ward boundaries of these communities by the Memphis and Shelby County Planning Commission.

## TABLE 5

REGISTERED VOTERS IN SHELBY COUNTY
6TH, 7TH, 8TH CONGRESSIONAL DISTRICTS

| CONG. DISTRICT: | JULY 3, 1972, AND %: | OCT. 5, 1974, AND %: | OCT. 22, 1975, AND %: |
|---|---|---|---|
| Sixth | 48,871 (13.7%) | 52,808 (15.1%) | 56,015 (15.4%) |
| Seventh | 51,809 (14.5%) | 54,454 (15.6%) | 56,934 (15.6%) |
| Eighth | 255,200 (71.8%) | 242,517 (69.3%) | 251,326 (68.9%) |
| TOTALS: | 355,880 | 349,779 | 364,275 |

## TABLE 6

Census Bureau - Department New Release, dated

March 21, 1975, (No. CB 75-64) gives the following population

estimates as of July 1, 1974:

Sixth Congressional District 518,000
Seventh Congressional District 520,000
Eighth Congressional District 504,000

Thus, from the above total district figures, and the July 1,

1974, Census Bureau Population Estimates for Tennessee Counties,

Shelby County residents would, as of 7/1/74, be apportioned as

follows:

SHELBY COUNTY RESIDENTS:

Sixth Congressional District 89,800 (12.2%)
Seventh Congressional District 141,100 (19.2%)
Eighth Congressional District 504,000 (68.6%)

TABLE 7

NUMBER OF ACTUAL VOTERS - SHELBY COUNTY

| CONG. DISTRICT: | 1972 ELEC.*and %: | 1974 ELEC.*AND %: | 1975 ELEC. AND %: |
|---|---|---|---|
| Sixth | 38,118 (15%) | 32,031 (15.7%) | 27,123 (14.8%) |
| Seventh | 39,030 (15.3%) | 26,886 (13.1%) | 27,179 (14.8%) |
| Eighth | 177,532 (69.7%) | 145,595 (71.2%) | 129,461 (70.4%) |
| TOTAL: | 254,680 | 204,512 | 183,763 |

* November general election

(Per Shelby County Election Commission)

TABLE 8

According to Department of Commerce Population Estimates for counties prepared jointly by the Bureau of the Census and the Tennessee State Planning Office, the following counties reflected growth rates of at least eight per cent (8%) from the 1970 Census to July 1, 1974:

| COUNTY: | CONGRESSIONAL DISTRICT: | % INCREASE: | AMOUNT OF INCREASE: |
|---|---|---|---|
| Williamson | 6th | 25.6% | 8,877 |
| Dickson | 6th | 17.8% | 3,923 |
| Lewis | 6th | 16.4% | 1,539 |
| Montgomery | 6th | 14.3% | 8,979 |
| Fayette | 6th | 13.2% | 3,008 |
| Henderson | 6th | 10.7% | 1,840 |
| Stewart | 7th | 10.5% | 781 |
| Lawrence | 6th | 10.1% | 2,903 |
| Henry | 7th | 9.9% | 2,351 |
| Hickman | 6th | 9.5% | 1,104 |
| Perry | 6th | 9.1% | 462 |
| Chester | 6th | 9.0% | 873 |
| Humphreys | 6th | 8.6% | 1,140 |
| McNairy | 6th | 8.5% | 1,531 |

Only two (2) Counties (Lake and Gibson) based on the same estimates, both in the 7th District, lost population during this same four (4) year period.

Three (3) Counties near Nashville had an estimated increase of nearly 22,000 reflecting suburban growth in that area.