648 P.2d 1207 (1982)
In re INITIATIVE PETITION NO. 317, STATE QUESTION NO. 556,
Henry BELLMON, Jenkin Lloyd Jones, and Edward L. Gaylord, Proponents,
v.
Carl ALBERT, Larry Derryberry, Ed Edmondson, Robert S. Kerr, Jr., and Clem McSpadden, Protestants.
No. 57824.
Supreme Court of Oklahoma.
June 25, 1982.
As Corrected July 1, July 12 and July 20, 1982.
Rehearing Denied July 20, 1982.
Stephen Jones, David McCormick Collins, James Craig Dodd, of Jones & Gungoll, Enid, Jerry T. Pierce, Bartlesville, for proponents.
John W. Swinford, D. Kent Meyers, John J. Griffin, Jr., Barbara Snow Gilbert, of Crowe & Dunlevy, Oklahoma City, for protestants.
*1209 IRWIN, Chief Justice:
This court is called upon to determine whether Initiative Petition No. 317, is sufficient, both numerically and legally, for submission to the vote of the people as State Question No. 556. The petition seeks to change the boundaries for Oklahoma's six congressional districts as established by the 1981 Legislature. The Legislature's congressional redistricting enactment (14 O.S. 1981, § 5) based upon the 1980 federal census, was approved by the Governor on July 22, 1981, and is now in full force and effect.
The parties who seek our determination that the petition is both numerically and legally insufficient will be called "Protestants" and the parties who seek to uphold its sufficiency will be called "Proponents".
Protestants' challenge to the numerical sufficiency of the signatures on the petition was referred to a Referee of this court. His Findings and Conclusions that the petition was sufficient and protestants' exceptions thereto, will be discussed later.
Before considering the issues presented, a brief summary of the events leading to this proceeding would clarify those issues. Precirculation filing of the petition with the Secretary of State took place August 31, 1981, and on that same day a copy of the proposed ballot title was filed with the Attorney General. On September 2, 1981, the Attorney General gave notice of non-conforming ballot title and filed a substitute title with the Secretary of State. Proponents timely appealed the Attorney General's ballot title ruling to this court.[1] This court approved the ballot title on December 8, 1981, in In the Matter of Proposed Ballot Title of State Question No. 556, Initiative Petition No. 317, 638 P.2d 450 (Okla. 1981). While approval of the ballot title was pending, Proponents commenced and completed circulation of the petition and the signed copies of the petition were filed with the Secretary of State on November 30, 1981. This November 30, 1981 filing was within the ninety (90) day period prescribed by 34 O.S. 1981, § 8.[2]

*1210 THE LEGAL SUFFICIENCY
Protestants challenge the legal sufficiency of the petition on the following grounds:
(1) It was circulated in violation of 34 O.S. 1981, § 9(D);
(2) It is invalid because it is in defective form contrary to 34 O.S. 1981, § 2;
(3) It was otherwise invalid because it is constitutionally vague and creates confusion;
(4) It violates § 54, Art. 5, of the Oklahoma Constitution because it would have a retroactive effect on election proceedings already begun;
(5) It violates Art. 1, § 2, of the United States Constitution and 2 U.S.C. § 2a(c), because it is a second congressional redistricting following the 1980 decennial census;
(6) It violates Art. 1, § 4, of the United States Constitution and 2 U.S.C. § 7, because it would result in changing the time for holding a congressional election other than as provided for in 2 U.S.C. § 7.
The circulation and filing of the signed petition while the application for approval of the ballot title was being processed is the basis for Protestants' first contention that the petition was circulated in violation of 34 O.S. 1981, § 9(D).[3] Protestants argue that when a copy of the proposed ballot title is filed with the Attorney General prior to circulation, under the clear language of § 9(D), supra, the ballot title must be fully "processed" and finally approved prior to circulation.
Proponents contend that a petition may be circulated at the same time that ballot title proceedings are pending and is legally sufficient so long as the signed petitions are filed within the ninety (90) day period prescribed by § 8, supra.
34 O.S. 1981, § 9(A)[4] and 9(D), supra, are the only sections in our Initiative and Referendum statutes (Title 34) which relate to the time for submission of a proposed ballot title for approval. Neither section makes reference to the 90-day period prescribed by § 8 for filing of the signed copies of the petition with the Secretary of State.
The language in § 9(D) was first adopted in 1965 (1965 Session Laws, Chapter 224, § 1). In 1967 this court decided In Re Initiative Petition No. 281, State Question No. 441, Okl., 434 P.2d 941, and held that the ninety (90) day period prescribed by § 8, supra, within which the signed copies of the petition must be filed with the Secretary of State commenced to run with the pre-circulation filing of the petition with the Secretary of State. No attempt was made in that proceeding to invoke the provisions of § 9(D) and we did not discuss it. Although the procedure for determining the sufficiency of an initiative petition has been changed since 434 P.2d 941 was decided in 1967, there has been no material change in the language in § 8, § 9(A) and § 9(D) that would affect these proceedings. Ballot title proceedings in 434 P.2d 941 were conducted pursuant to § 9(A) after the petition had *1211 been circulated and determined to be legally sufficient. This was proper because § 9(A) relates to "when a measure is proposed ... by initiative petition" and we have held a measure is proposed when it is found to be sufficient in form by the authority authorized by law to pass upon and determine the sufficiency thereof and such finding and determination has become final.[5]
This court has also considered when initiative petitions could be circulated when ballot title proceedings were initiated under § 9(D). In In Re State Question No. 541, Initiative Petition No. 310, 601 P.2d 103 (Okl. 1979) we said:
"We are further of the opinion that the ninety (90) day period within which time electors must sign petition in support of initiative or referendum petitions shall begin to run when ballot title approved and accepted by this Court, as described aforesaid, is filed with the Secretary of State, 34 O.S. 1971, § 8, and 34 O.S. 1971, § 2 et seq,"[6]
Likewise, in In Re Initiative Petition No. 315, State Question No. 553, 649 P.2d 545, we stated that:
"... The 90-day period for circulation does not begin until the proposed ballot has been reviewed by the Attorney General, the 10-day appeal period has expired, and any appeals timely filed, exhausted."
Protestants cite the above two cases in support of their contention that the initiative petition here is invalid because it was circulated in violation of § 9(D).
The above cases are not dispositive of the issue presented here. In 601 P.2d 103 the petition had not been circulated when the ballot title was finally accepted and approved and we held that the proponents of the initiative petition would be granted 90 days from date of filing the approved and accepted ballot title with the Secretary of State to circulate the petition. In 649 P.2d 545, the petition was circulated after the ballot title proceedings had become final. We declared such circulation was proper and the matter was referred to a referee to determine the sufficiency of the signatures on the petition. Our holding in the above cases did not establish that if the provisions of § 9(D) are invoked that such invocation precludes circulation of the petition until ballot title proceedings have been finally concluded.
In our opinion § 9(D) provides an alternate time for a citizen desiring to circulate an initiative measure to commence and complete ballot title proceedings. Section 9(D) also permits such person the right to delay the running of the 90-day period prescribed by § 8, until the ballot title proceedings have been completed.[7] Section 9(D) is an alternative to § 9(A) because under 9(A), ballot title proceedings may not be commenced until the petition has been circulated, filed with the Secretary of State, and its legal sufficiency finally determined. Sections 8 and 9 must be construed together and a determination that the invocation of § 9(D) prohibits the circulation of a proposed initiative petition until the ballot title proceedings have been finally concluded *1212 would nullify the 90-day proviso in § 8 which provides for the filing of the signed copies of the petition with the Secretary of State within 90 days after its initial filing.
We hold that when a person proposes to circulate an initiative petition and invokes the provisions of § 9(D) within ten (10) days after filing a true and exact copy of said petition in the office of the Secretary of State, the ninety (90) day period for circulating the petition may begin to run from the day it was filed in the office of the Secretary of State, or in the alternative, the 90-day period may begin to run after the proposed ballot title has been reviewed by the Attorney General, the 10-day appeal period has expired, and any appeals timely filed, exhausted.[8] The person proposing to circulate the initiative has the option to choose which one of the two times the 90-day period shall commence to run.
We hold that initiative petition No. 317 was legally circulated and timely filed because the signed copies were filed with the Secretary of State within 90 days after the initial filing in the office of the Secretary of State. Proponents' invocation of § 9(D) did not render the circulation period inoperative and such circulation within the 90-day period was proper.
Protestants' next contention relates to the legality of a second congressional redistricting enactment based on the 1980 federal decennial census. Protestants contend that the Legislature has already enacted one valid congressional redistricting act based on the 1980 census and that the United States Constitution (Art. 1, § 2) and federal statutory law, 2 U.S.C., § 2a(c),[9] implicitly prohibit a second enactment. Protestants argue that the Federal Constitution and the above statutory provision only allows one congressional redistricting to occur during a ten-year period covered by the decennial census. Preisler v. Secretary of State of Missouri, 279 F. Supp. 952, 1004 (W.D.Mo. 1967) and Grills v. Branigin, 284 F. Supp. 176 (S.D.Inc. 1968) cited by Protestants, do not appear to be controlling, for they deal primarily with the maxim "one man, one vote." There is no express prohibition contained in the constitutional provision, nor in the statute, which would prohibit a second valid congressional redistricting within the ten-year period following a decennial census. The case of Exon v. Tiemann, 279 F. Supp. 603, 608 (D.C.Neb. 1967),[10] cited by the Proponents, contains language to the effect that there is no federal constitutional limitation on congressional redistricting occurring more than once in a ten-year period following a federal decennial census.
The first power reserved to the people is the initiative, Art. 5, § 2, Okla.Const. Our Constitution in no way restricts the initiative against a legislative congressional enactment. Proponents point out that this is not the first time in Oklahoma that an initiative has been sought amending a legislative congressional redistricting act. In November, 1956, State Question No. 357, Initiative Petition No. 253, 268 P.2d 844, was submitted to the electorate of Oklahoma to amend a 1951 legislative congressional *1213 redistricting act based upon the 1950 federal census. Admittedly, such historic action is not controlling precedent but is persuasive.
We hold that the electorate of Oklahoma are entitled to invoke the initiative against a legislative congressional redistricting act even though the initiative and the legislative enactment occur during the same ten (10) year period and are based upon the same federal census.
Three of Protestants' contentions that the petition is invalid are based upon speculative facts that no special election will take place prior to the November 2, 1982, general election.[11] They argue that one may speculate that the drafters of the petition intended a second congressional election would somehow occur, sometime after the general election. Protestants then contend that if this be so it would violate 2 U.S.C., § 7[12] which specifically provides when congressional elections must be held. Protestants also contend that § 5 of the Petition[13] renders the petition invalid because it would have an impermissible retroactive effect. Protestants argue that long before the petition is voted on at the general election, the laws require the filing for offices, the primaries, and run-off elections, and the party nominees would be elected the same day the petition will be voted on, and because "the Petition would adversely and retroactively affect proceedings and candidates in the 1982 congressional elections, it is unconstitutional."
The argument advanced by the Protestants in no way affects the validity of the Petition. However, Protestants' material contentions are considered and determined in a "Concurring" opinion of Justice Doolin, concurred in by five (5) other members of this court. That opinion holds that the 1982 Congressional Elections must be held under the 1981 Legislative Enactment, 14 O.S. 1981, § 5, and if the Petition is approved at either the 1982 General Election or at a prior Special Election its approval at either election would not affect the 1982 Elections conducted pursuant to the 1981 Legislative Enactment. Although that opinion is styled "Concurring" opinion, it has the same force and effect as any other opinion of the court which has a concurrence of the majority of its members as provided by Art. 7, § 5 of the Oklahoma Constitution.
We hold that Initiative Petition No. 317, is legally sufficient.

NUMERICAL SUFFICIENCY OF PETITION
This proceeding was bifurcated by this court with reference to a Referee to determine the numerical sufficiency of the petition. Under a proposed schedule submitted by the parties, signature challenge hearings before the Referee were to be completed by May 26, 1982.
Hearings were conducted and were terminated on May 21, 1982. On May 24, 1982, the Referee submitted his Report which, inter alia, states:
On the basis of all of the evidence adduced at the hearings, as established by a fair preponderance thereof, taking into consideration the weight, credibility and sufficiency of all of such evidence, and further taking into consideration the legal presumption of the validity of the signatures, the referee makes the following findings and conclusions:

*1214 1. The gross number of presumptively valid signatures affixed to Initiative Petition No. 317, as determined by order of the Supreme Court entered December 14, 1981, is 109,828.
2. The number of valid signatures required to place the proposition before the electorate is 91,977, computed as 8% percent of one million one hundred forty-nine thousand seven hundred and eight (1,149,708), which is the total vote cast for the office of presidential electorate in the general election conducted November 4, 1980, and invalidity of 17,852 signatures would render the petition invalid.
The Referee then set forth thirty-eight (38) separate contested categories of alleged insufficiency of signatures, discussed them in detail and finally concluded that:
... . not to exceed 13,435 signatures should be stricken from Initiative Petition No. 317, as invalid. The referee further concludes that this would leave Initiative Petition No. 317 with 96,393 valid signatures.
It is, therefore, recommended that Initiative Petition No. 317 be held to bear a sufficient number of valid signatures for submission to vote of the electorate.
Protestants filed their Exceptions to the Referee's Report and challenge eight (8) of the thirty-eight (38) categories that had been contested in the evidentiary hearings before the Referee and included in his Report. We will consider Protestants' Exceptions to the Referee's Report.

I
The Referee found that the Protestants had challenged 18,525 signatures of persons signing the petition on the ground they were not registered voters. These challenges were based on checks of certain voter registration records in various counties throughout the state. For Oklahoma and Tulsa Counties, the check was made against computerized voter registration lists (VRL's) printed from computerized tapes of the Oklahoma and Tulsa Counties' election boards. The Referee found that 10,579 persons signing the petition were not registered voters. In making his decision the Referee relied on In the Matter of Referendum Petition No. 119, State Question No. 381, 339 P.2d 530 (Okl. 1959); In re Initiative Petition No. 142, State Question No. 205, 176 Okl. 155, 55 P.2d 455 (1936); In re Initiative Petition No. 23, State Question No. 38, 35 Okl. 49, 127 P. 862 (1912).
Protestants excepted to the Referee's findings. They argue that the Proponents' evidence of voter registration was inadmissible because the Proponents did not obtain their evidence by using official voter registration lists. Protestants insist that without the allegedly improper evidence the Proponents' evidence is "insufficient as a matter of law." They argue that it was error for the Referee to give any weight or credibility to the Proponents' evidence because their evidence was not obtained by comparison of the names on the petition with official voter registration data or copies thereof.
Protestants overlook the fact that it is they who have the burden of proof. When an initiative petition is being challenged, the signatures thereon are presumed to be valid, and the challenger has the burden of overcoming that presumption. In re Initiative Petition No. 142, State Question No. 205, supra; In re Initiative Petition No. 272, State Question No. 409, 388 P.2d 290 (Okla. 1964). The Referee found the names of the petition signers which Protestants challenged for Oklahoma and Tulsa Counties were not checked against the actual voter registration certificates on file at the county election boards. The Referee discussed in detail the evidence submitted by Protestants and Proponents. In finding 10,579 signatures invalid where 18,525 were challenged, the Referee made an implicit finding that the Protestants had failed to carry their burden of proving the invalidity of 7,946 signatures. We approve this finding.

II
The Referee also found that the Protestants had challenged 497 signatures *1215 on the ground they were illegible. Of the challenged signatures the Referee found 460 illegible, citing Oklahomans for Modern Alcoholic Beverage Controls, Inc. v. Shelton, 501 P.2d 1089 (Okla. 1972); and the Protestants except to that finding, insisting that none of the signatures can be read.
Only a registered voter may sign an initiative petition. 34 O.S. 1981, § 23; In re Initiative Petition No. 142, State Question No. 205, supra; Oklahomans for Modern Alcoholic Beverage Controls, Inc. v. Shelton, supra. When a signature is illegible, then the identity of the signer cannot be determined and it is impossible to determine whether or not the signer was a registered voter. We approve the Referee's report in reference to these 497 challenged signatures.

III
The Referee found that the Protestants had challenged 896 signatures as duplicates of other signatures on the petition, and that 758 of those signatures were invalid, relying on Oklahomans for Modern Alcoholic Beverage Controls, Inc. v. Shelton, supra. Protestants excepted to his finding, urging that all 896 signatures should be declared invalid. We approve the Referee's Report in reference to those 896 challenged signatures.

IV
The Referee found that the Protestants had challenged 2,593 signatures for defects in the affidavits on the signature sheets: some affidavits are incomplete, names of signers are not written or are only partially written on some affidavits, and on some affidavits the names of signers have been written in cursive instead of being printed or typed. The Referee concluded that these challenges were without merit, citing In re Initiative Petition No. 272, State Question No. 409, supra; In re Initiative Petition No. 176, State Question No. 253, 187 Okla. 331, 102 P.2d 609 (1940); and In re Initiative Petition No. 23, State Question No. 38, supra. The Protestants except to that conclusion.
Title 34 O.S. 1981, § 24, provides that super-strict adherence to the statutes is not required:
The procedure herein prescribed is not mandatory, but if substantially followed will be sufficient. If the end aimed at can be attained and procedure shall be sustained, clerical and mere technical errors shall be disregarded.
The challenges rejected by the Referee are on technical grounds. They are not so serious that this court will say there has not been substantial compliance with the prescribed procedure. We approve the Referee's Report in reference to these 2,593 challenged signatures.

V
Next the Referee rejected challenges to 336 signatures based on the failure of the circulators to give street, rural route or post office box addresses. He based his decision on In re Initiative Petition No. 224, State Question No. 314, etc., 197 Okla. 432, 172 P.2d 324 (1946); and In re Initiative Petition No. 176, State Question No. 253, supra. Protestants have excepted to the Referee's conclusion.
A circulator is not required to give a residential address but is required by 34 O.S. 1981, § 2, to give only a post office address.

VI
The Referee found that the Protestants had challenged 1151 signatures on the ground that they were printed instead of written in cursive. Relying on Oklahomans for Modern Alcoholic Beverage Controls, Inc. v. Shelton, supra, he found no showing of fraud or deceit and allowed the signatures. Protestants have excepted to that conclusion, arguing that a printed name is not a signature.
If a voter chooses to print his or her name instead of writing it in cursive, then the printed name is the voter's signature. The burden is upon the Protestants to overcome the presumption of validity of a signature and without some showing that a *1216 printed signature was placed on the petition by someone other than the voter, the Referee's conclusion was correct and we approve it.

VII
The Referee found that the Protestants had challenged 4,963 signatures on the ground that the signers had given insufficient addresses. In each case the signer's city of residence was one other than Oklahoma City or Tulsa. The Referee upheld the validity of the signatures and Protestants have excepted. They urge this court to require street names and house numbers for signers.
The Referee found that this category of challenge was invalid in that there was an absence of proof of a purpose to deceive or a showing that by reason of the omission of a street address in a city or town other than Oklahoma City or Tulsa, signers could not have been located. The Referee concluded that the signatures challenged under this category are valid, citing In re Referendum Petition No. 3, City of Claremore, 85 Okl. 117, 205 P. 133 (1922); In re Initiative Petition No. 89, State Question No. 138, 114 Okl. 285, 244 P. 801 (1926); and In re Initiative Petition No. 142, State Question No. 205, supra.
This court has previously required streets and numbers only in Oklahoma City and Tulsa. In re Initiative Petition No. 142, State Question No. 205, supra. In that case it was held that signers giving an address of "General Delivery" had substantially complied with the requirements of law. The need for an address is for verification purposes; if a signer can be located through due diligence, then the address given is sufficient.
Protestants argue that implicit in our decision in In re Initiative Petition No. 142, State Question No. 205, was a recognition that the time would come when other cities in the state would grow to the point where house and street numbers would be required. Protestants point out the growth in population that several cities in Oklahoma have experienced in the past twenty or thirty years.
Perhaps Protestants may be right in anticipating what this court might do in the future, but this court will not invoke the requirement that every signer of an initiative petition must give his street address in the case at bar. Protestants made no attempt to show that any of the 4,963 signers who allegedly gave insufficient addresses could not have been located with due diligence. We approve the Referee's Report in reference to the 4,963 challenged signatures.

VIII
Finally, the Referee found that the Protestants had challenged six signatures because a business address had been given. Protestants excepted to the Referee's conclusion that such addresses are acceptable. There is no merit to this challenge and we approve the Referee's report in reference to it.
Protestants take general exceptions to the Referee's Report on the grounds that there were many narrow issues litigated by the parties and the Report does not discuss some of those important and material issues nor does the Report adjudicate the sufficiency of the procedure used by either party. Protestants request that a supplemental report be submitted that sets out the specific legal grounds for upholding challenges to signatures on the basis of non-registration. Protestants argue that without specific rulings as to specific issues litigated, parties in future protest proceedings are seriously prejudiced.
As we discussed in Paragraph 1, supra, Protestants challenged 18,525 signatures because of non-registration. The Referee discussed the challenged signatures in detail. Admittedly, he did not discuss in detail each and every signature which he held valid; but Protestants have failed to point out in what respect his findings and conclusions are erroneous. Protestants' request that this cause be remanded for more specific findings by the Referee is denied.
*1217 The Report of the Referee is approved and we hold that Initiative Petition No. 317 has a sufficient number of valid signatures.

ADJUDICATION
Initiative Petition No. 317 declared sufficient, both numerically and legally, for submission to the vote of the people as State Question No. 556.
HODGES, DOOLIN, HARGRAVE and WILSON, JJ., concur.
LAVENDER, J., concurs specially.
OPALA, J., concurs in the judgment.
BARNES, V.C.J., and SIMMS, J., dissent.
DOOLIN, Justice, specially concurring:
I concur with the majority, but believe my learned colleagues do not go far enough in the analysis of the issues in this case. If this State is to qualify representatives for the National House of Representatives which will convene and organize on January 3, 1983, we must embark upon the consideration of prospective facts and conditions. It behooves us to inquire and look into the "seeds of time," and speak. The specter of challenge, contest and litigation should be laid to rest in so far as it is possible to do so.
The element of time[1] presented in this case forces us to consider and interpret the process of orderly congressional elections for Oklahoma in 1982. Not only must elections be orderly and contribute to the stability of government, they must not be disruptive of the elective process.[2]
The supremacy of the United States Constitution, Art. I, § 4, as well as 2 U.S.C. § 7, dictates that Oklahoma's congressional elections must be held the Tuesday next following the first Monday in November of the even numbered years. Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717 (1880) and Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884).
Oklahoma's congressional elections for the year 1982 must follow the legislative districting plan and that representatives must be elected from the districts created therein. 14 O.S.Supp. 1981, § 5. Because of the inexorable running of time only the legislative redistricting plan can meet the demands of 2 U.S.C. § 7[3] with its provisions setting the commencement of the Congress for January 3, 1983.
No special election under the initiative petition, if it should pass, could be called for thirty days. 26 O.S.Supp. 1974, § 12-116. After the passage of the thirty days provided for in the section last referred to, § 12-117 of Title 26 requires the state-election board to conduct a special election in the same manner as provided in conducting state-wide primaries, run-off primaries and general elections.
Twenty-six O.S.Supp. 1977, § 1-102 provides for primary elections on the 4th Tuesday in August in the even numbered years. Run-off primary[4] is set for three weeks later on the 3rd Tuesday in September and the general election is set for the Tuesday next after the 1st Monday in November.[5] The Legislature has not considered or provided a calendar for special congressional *1218 elections such as is presented to us. There is a provision for elections covering vacancies in congressional offices. 26 O.S.Supp. 1979, § 12-101 et seq. Section 12-103 of such title, provides for filing, primary, runoff and general election with this proviso:
"...
Should such a vacancy occur between March 1 and July 1 of an even-numbered year, when a special election is required, the proclamation must contain dates that are the same as are required by law for the regular filing period, Primary Election, Runoff Primary Election and General Election."
Absent the death, resignation, etc. of a present incumbent congressman before July 1, 1982, there are no occurring vacancies. The proviso does not apply absent such condition.
The fact the Legislature has failed to consider and provide for the situation here presented, adds to and strengthens my conviction there can be no election for congressional districts in Oklahoma to the House of Representatives except under the legislatively enacted districts in the year 1982.[6]
Oklahoma must preserve a representation in Congress and if we believe that elections should be orderly and not disruptive, then it logically follows the 1982 elections must be held under the legislative redistricting plan. It also follows if the initiated measure should pass, then it will go into effect for the 1984 elections. We are not unmindful of Art. V, § 3 of the Oklahoma Constitution which provides that a measure referred to the people by initiative petition shall take effect and be in force when it shall have been approved by the majority of the votes cast thereon. In my opinion the fact situation in existence does not suspend the operative effect of the legislative redistricting plan.
The act of filing under the legislative plan on July 5, 1982, is the opening act of the November election. Filing is "an action begun," under Art. 5, § 54 of the Oklahoma Constitution. Article 5, § 54 indicates a repeal of a statute (legislative redistricting in our case) shall not revive the statute repealed, "nor shall such repeal effect any accrued right ... or proceedings begun by virtue of such repealed statute." We are not prepared to say a nominee or candidate has an accrued right to an office or position, but there is no doubt that proceedings toward election has begun. Filing begins the proceedings toward the 1982 congressional elections.
Two Oklahoma cases, Green v. Board of Commissioners, 126 Okl. 300, 259 P. 635 (1927) and In Re Application of the Board of Education, 565 P.2d 677 (Okl. 1977)[7] support the proposition that proceedings commenced under a statute later repealed shall continue under the repealed statute even to an election held. These cases rely on Art. V, § 54. We realize the last cited cases are distinguishable in fact, but to us they are sound in their rationale when they hold the commencement of a proceeding under a repealed statute continues under the repealed statute.
Under the present law in Oklahoma, it is settled that an initiated measure "must be submitted to the people for their vote at the next general election, with or without any act on the part of the Governor[,] or it may be submitted at any other time by executive directive or proclamation of the Governor whether or not the date of submission be the same date as that upon which a primary or run-off primary election be held," State v. State Election Board of Oklahoma, 318 P.2d 422, 425 (Okl. 1957). See also Williamson v. Carter, 177 Okl. 382, *1219 59 P.2d 948 (1936) and Simpson v. Hill, 128 Okl. 269, 263 P. 635, 637, 56 A.L.R. 706 (1927).
Thus without a special election the initiated measure must be voted on by the people on November 2, 1982.
The protestants attack section 5 of the Initiative Petition:
"The Congressional Districts described herein shall become effective at the beginning of the terms of the members of the United States House of Representatives elected in 1982, provided however, members of the United States House of Representatives elected in 1982 shall be nominated and elected in the districts set out herein prior to receipt of any kind of certificate of election."
This section is a monster similar to the mythical Hydra. If a candidate has filed for office, or won in the primaries or has been elected in the general election, how can his acts and procedures, under a validly enacted redistricting plan, be effected by a nonexistent vote on an initiated plan? Is it possible for a candidate who files, runs, or is elected in a validly constituted district to be ousted by an initiated measure which has not or may not come into existence until after or contemporaneous with his election or actions?
Section 5 of the Initiative Petition is vague, confusing, invalid and unconstitutionally so. Section 5, if enacted, would be disruptive of the electoral process and would promote instability.
The protestants argue that such vice in section 5 renders the entire initiated program invalid. We do not agree, for the initiated measure in section 7 thereof contains a severance and savings clause. We have held an invalid portion of a statute on constitutional considerations does not affect the remainder of the statute unless the objectionable portion is so inseparable and connected with the remainder of the statute that it cannot be passed with the invalid portion. Musick v. State ex rel. Miles, 185 Okl. 140, 90 P.2d 631 (1939); Dowell v. Board of Education of Oklahoma County, 185 Okl. 342, 91 P.2d 771 (1939) and Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062 (1932).
As we review the petition, construing it in its entirety under the above cited rules, we find section 5 is not so inseparably connected with the Initiative Petition so that it cannot be presumed the voters would have passed it without the invalid portion.
The proponents suggest if the initiated measure carries at the general election on November 2, 1982, vacancies will have occurred and 2 U.S.C. § 8 authorizes filling vacancies on the grounds of failure to elect.[8]
The vice of this argument lies in the fact that there would be no vacancies on November 3rd, for they have been filled under the legislative redistricting plan. It also refutes or is contrary to the "proceedings begun" doctrine as discussed supra. It presumes section 5 of the Initiative Petition is valid and constitutional. The truth of the matter is, there will be no vacancies on November 3rd, for the positions will have been cotemporaneously filled if the initiated measure happens to pass on that date.
The protestants argue the petition is in defective form and contrary to the requirements of 34 O.S. 1981, § 2. In support of this proposition the protestants zero in on that portion of the petition wherein it states a preference, that the Governor order a special election. In In Re Referendum No. 130, State Question No. 395, 354 P.2d 400 (Okla. 1960), it was held that pursuant to 34 O.S. 1981, § 24 substantial compliance is the standard for the sufficiency of the petition language. It appears to us in this instance there has been substantial compliance *1220 with the language of the petition in meeting the requirements of 34 O.S. 1981, § 2. The addition of the language expressing the preference of the voters for a special election does not appear to detract from substantial compliance with 34 O.S. 1981, § 2. That language only expresses a preference and does not attempt to usurp the discretionary powers of the Governor to call a special election on the Initiative Petition.
Congressional elections for 1982 must be held under the legislative plan of redistricting.
I am authorized to state that IRWIN, C.J., BARNES, V.C.J., and HODGES, HARGRAVE and WILSON, JJ., concur with the views herein expressed.
BARNES, Vice Chief Justice, dissenting.
I concur in the dissent of Justice Simms, but I dissent for the further reason that I do not believe that the Referee's Report is comprehensive enough to allow me to properly evaluate it. I would ask the Referee for a supplemental report setting out his reasons for admitting some signatures in a particular category while excluding others. As pointed out in the Protestants' Motion for Order Requiring Supplemental Referee's Report, it does not indicate which 10,579 of the 16,227 names challenged were invalid, nor why certain names were valid and others were not. Before I can make a final decision on the sufficiency of the signatures I need to know the criteria used by the referee to disqualify names on the petition for non-registration.
SIMMS, Justice, dissenting.
I must respectfully dissent. Title 34, O.S. 1981, § 9(D) clearly and unequivocally precludes circulation of an initiative until completion of the appeal process. This Court so held in In Re: State Question No. 541, Initiative Petition 310, Okl., 601 P.2d 103 (1979); In Re: Initiative Petition No. 315, State Question 553, Okl., 649 P.2d 545 (1982). See also, Opinion of The Attorney General, No. 80-116. I would hold the petition invalid as it was circulated outside the statutory 90 day period.
I am authorized to state that Vice Chief Justice Barnes joins me in this dissent.
LAVENDER, Justice, concurring specially:
I concur only in the resolution of the issues affecting the validity of this Initiative Petition. This Court traditionally has declined to concern itself with academic questions disconnected from the granting of actual relief.[1] Here the proponents seek only to have their proposed measure submitted to a vote of the people of Oklahoma. The contestants seek only to prevent that from happening. We have finally resolved the issues favorably to the proponents  it is now time for the people to vote. It is not proper to speculate at this time before the people have had an opportunity to vote as to what effect a favorable vote on the measure might have.
I am authorized to state that Justice Opala joins in the views herein expressed.
OPALA, Justice, concurring in the judgment:
At issue here is the legal efficacy of Initiative Petition No. 317. Sponsored by the Republican Party and challenged by prominent leaders of the state's Democratic Party, the measure before us proposes a change in the legislatively defined boundaries for Oklahoma's six congressional districts. 14 O.S. 1981 § 5. The court declares the petition valid for submission to a vote. I join the court's judgment but recede from its pronouncement on two points. With these two I would deal differently. In my view, (1) the statutory ninety-day circulation period within which signatures on an initiative petition may be procured cannot be arrested or suspended either by the institution or by the pendency of ballot title approval or appeal process but begins to *1221 run, by force of law, the day a blank (precirculation) copy of the petition is filed with the Secretary of State, 34 O.S. 1981 §§ 2 and 8 and (2) the clear and unequivocal command of 34 O.S. 1981 § 2, requiring urban signers of a petition to identify their in-city residence by street name and house number, should be applied  prospectively  to all persons residing within the corporate limits of a city  not just to signers from the "congested centers" of Oklahoma City and Tulsa. In Re Initiative Petition No. 142, State Question No. 205, 176 Okl. 155, 55 P.2d 455, 458 [1936].

I.

THE CIRCULATION OF AN INITIATIVE PETITION MUST BEGIN WHEN THE BLANK (PRE-CIRCULATION) COPY IS FILED
"Circulation period" of an initiative petition is a term of art. It means the time during which signatures upon it may legally be garnered. The law will not tolerate an indefinite point for the beginning of that interval. The statute unequivocally requires the filed blank (pre-circulation) copy to state the date "when petition is to be opened for signatures". § 2.[1] If that "opening date" may be postponed indefinitely and thus be left uncertain during the pendency of a § 9 ballot title approval or of a § 10 appeal process, the proponents of a petition  who wish an early approval of their ballot title  would never be able to comply with that mandatory requirement of § 2 which calls on them to insert in the filed pre-circulation copy the date that marks the commencement of a signaturegathering period. The provisions of § 8 clearly refer to the ninety-day circulation time span as being that which follows the filing of a "true and exact [pre-circulation] copy" of the petition.
The correctness of this conclusion  that the statutory circulation period inexorably runs from the day of the first (pre-circulation) filing  finds eloquent support in the 1977 adaptation of the state initiative-and-referendum procedures to municipalities. Laws 1977, ch. 256, Art. XV, § 15-101 et seq. Subsequent legislation is always a fit source to consider as an aid in construing prior enactments upon the same subject. Letteer v. Conservancy District No. 30, Okl., 385 P.2d 796, 801 [1963]. Article XV of the Municipal Code unequivocally provides in 11 O.S. 1981 § 15-103 C that the signed copies of an initiative petition must be filed "within ninety (90) days after the initial filing of the measure ...", even though ballot title approval process for a municipal initiative petition may begin  as it is the case under state procedure in § 9 D  "prior to circulating the petition". 11 O.S. 1981 § 15-105 A. Once a blank (precirculation) copy of the petition has been filed, the ninety-day period is triggered exlege. Nothing can stop it. There is no authority in § 9 D for suspending any part of the period in progress.
Aside from principles of statutory interpretation, there are some serious considerations of public policy that militate against allowing a § 9 ballot title approval proceeding to arrest or suspend the commencement of the circulation period. Once the filing has occurred, proponents may not always be able to restrain zealous circulators from beginning to solicit signers. A great number of challenges might be generated in this court upon a claim of surreptitious or clandestine circulation efforts. Many such complaints are apt to raise most complicated issues of fact which will be difficult of resolution. I cannot give countenance to a rule of law so likely to generate the spectre of corruption, deception, fraud and undue advantage. Were I convinced that the Legislature did in fact intend to authorize the suspension that is sanctioned by today's opinion, I would seriously question the constitutional validity of § 9 D. Fundamental law will not give sanction to legislation that impairs or burdens the integrity of our initiative or referendum process or is plainly inconsistent with the legislative responsibility to prevent corruption. State ex rel. Caldwell v. Hooker, 22 Okl. 712, 98 P. 964, *1222 965 [1908] and Associated Industries v. Oklahoma Tax Commission, 176 Okl. 120, 55 P.2d 79 [1936]. The lawmaking body stands commanded by Art. 5 § 8, Okl.Const., to guard against all forms of corrupt practice by the enactment of appropriate measures.
The statutory scheme of procedure will not permit the ninety-day circulation period to be deferred by ballot title approval or appeal proceedings. Any suspension of this period is potentially harmful to, and destructive of, the essential integrity in the initiative process. In Re Initiative Petition No. 315, State Question No. 553, 649 P.2d 545 (Opala, J., concurring in result). My counsel now is the same as that given in the case last cited. I would overrule all the aberrational holdings that began with In the Matter of the Proposed Title of State Question No. 541, Okl., 601 P.2d 103 [1979].

II.

THE COMMAND OF § 2 THAT URBAN SIGNERS IDENTIFY THEIR RESIDENCE BY STREET NAME AND HOUSE NUMBER SHOULD BE GIVEN FULL EFFECT
Section 2 provides that signers who live "in the city ... [give their address by] street [name] and [house] number." Our case law recognizes the § 2 requirement as applicable only to residents of Oklahoma City and Tulsa. In Re State Question No. 138, 114 Okl. 285, 244 P. 801, 805 [1926] and In Re Initiative Petition No. 142, State Question No. 205, supra, 55 P.2d at 458.
Because there are now many "congested centers" in the State, I would give full effect to the command of § 2 by requiring  prospectively  that henceforth all signers of an initiative or referendum petition who reside within the corporate limits of a city identify their residence by street name and house number. Nothing less should, under § 24, be deemed to constitute substantial compliance with the terms of § 2.

III.

THE COURT SHOULD NOT FORECAST ITS DECISION UPON AN ISSUE NOT YET IN ACTUAL CONTROVERSY BEFORE IT
In another opinion herein the court decides today that if the petition were adopted by a vote at the next (1982) general election or at an earlier special election, its passage would not affect this year's (1982) congressional races.
I agree with the view of Lavender, J. that the court should not now render its opinion as to the legal effect the passage of the measure would have either upon congressional races to be held this year or upon the 1982 general election results. That issue cannot become justiciable until the measure now approved for submission has been adopted by the people. Threadgill v. Cross, 26 Okl. 403, 109 P. 558 [1910]. Today's forecast of the court's decision upon a controversy not yet in legal existence may have a chilling effect on the Governor's willingness to submit the petition to a vote at a special election and on the voters' enthusiasm for the measure as a legal vehicle for gaining immediate relief from an unwanted legislative redistricting plan. Because our constitution has cast this state's judicial service in a neutral, non-partisan posture, court pronouncements should desist  short of absolute legal necessity  from influencing purely political decision-making choices. "The guiding consideration is that the administration of ... [adjudicative process] should reasonably appear to be disinterested as well as be so in fact." Public Utilities Commission v. Pollak, 343 U.S. 451, 466, 72 S.Ct. 813, 822-823, 96 L.Ed. 1068, 1079-1080 [1951] [Frankfurter, J., disqualifying].
Because I fail to apprehend danger from following the traditional path of judicial restraint, I would decline to entertain, at this time, the prematurely tendered dispute over the legal effect the adoption of the petition would have either upon congressional races this year or on the 1982 general election results.
*1223 I am authorized to state that BARNES, V.C.J., and LAVENDER and HARGRAVE, JJ., concur in the views expressed by me in Part II and that LAVENDER, J., concurs in the views expressed in Part III.

ORDER
Protestants' Motion for Order Requiring Supplemental Referee's Report is denied.
Petitions for Rehearing, if any, and briefs in support thereof shall be filed on or before July 6, 1982.
DONE BY ORDER OF THE SUPREME COURT IN CONFERENCE this 25th day of June, 1982.
NOTES
[1] 34 O.S. 1981, § 10(A), provides:

"Any person who is dissatisfied with the wording of a ballot title may, within ten (10) days after the same is filed by the Attorney General with the Secretary of State as aforesaid, appeal to the Supreme Court by petition in which shall be offered a substitute ballot title for the one from which the appeal is taken. Upon the hearing of such appeal, the court may correct or amend the ballot title before the court, or accept the substitute suggested, or may draft a new one which will conform to this chapter."
[2] 34 O.S. 1981, § 8, provides in pertinent part as follows:

"When a citizen or citizens desire to circulate a petition initiating a proposition of any nature, ... such citizen or citizens shall, when such petition is prepared, and before the same is circulated or signed by electors, file a true and exact copy of same in the office of the Secretary of State and, within ninety (90) days after such filing of an initiative petition, the signed copies thereof shall be filed with the Secretary of State..."
[3] 34 O.S. 1981, § 9(D), provides:

"Persons proposing to circulate an initiative petition may file with the Attorney General, within ten (10) days after filing a true and correct copy of said petition in the office of the Secretary of State, a copy of a proposed ballot title prior to the circulation of the initiative petition, which ballot title shall be processed as otherwise provided in this act prior to the circulation of the initiative petition and in which event it need not be submitted for any further approval thereafter."
[4] 34 O.S. 1981, § 9(A), in pertinent part, provides:

"When a measure is proposed ... by initiative petition, whether as an amendment to the Constitution, or as a statute, it shall be the duty of the parties submitting such proposition to prepare and file one copy of same with the Secretary of State and one copy with the Attorney General, such copies to contain a ballot title of not exceeding one hundred fifty words, which shall contain the gist of the proposition couched in language that may be readily understood by persons not engaged in the practice of law."
[5] In In re Initiative Petition No. 2 of Cushing, 157 Okl. 54, 10 P.2d 271, 272 (1932) we specifically considered and determined the meaning of the phrase "when any measure is proposed by initiative petition" as used in § 9(A). See also In re Initiative Petition No. 1, City of Drumright, 298 P.2d 409 (Okla. 1956).
[6] The Attorney General in his opinion No. 80-116, dated June 16, 1980, discussed Initiative Petition No. 310, 601 P.2d 103, but expressed the view that the ninety (90) day period will commence to run after ballot title proceedings have been processed only if the person seeking initial review of ballot title under § 9(D) refrains from circulating the petition until such time as the title has been processed. He expressed the view that commencement of circulation of the petition at any point prior to this time would constitute a waiver of the right to defer the running of the 90-day period.

The initiative petition in the case at bar was circulated after our 601 P.2d 103 decision in 1979 and the Attorney General's opinion in 1980, and prior to our 1982 decision in 649 P.2d 545.
[7] In Re State Question No. 541, Initiative Petition No. 310, 601 P.2d 103 (Okl. 1979); and In Re Initiative Petition No. 315, State Question No. 553, 649 P.2d 545.
[8] The Attorney General's opinion No. 80-116 might be interpreted to mean that the 90-day period might be commenced at a different time other than the two times herein set forth. We cannot accede to this view.
[9] "Section 2. The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."
[10] "Congressional redistricting differs from legislative redistricting in an important aspect that should be mentioned here. Under Section 5 of Article III of the Nebraska Constitution, the Legislature may redistrict itself not more often than once in ten years. There is no such limitation on Congressional redistricting. It would appear from Exhibit 6 that the Legislature should consider and may need to change Congressional District boundaries at each legislative session if it determines upon a policy of redistricting as opposed to a policy of electing representatives at large." See also State of Ohio on relation of Davis v. Hildebrant, 241 U.S. 565, 36 S.Ct. 708, 60 L.Ed. 1172 (1916); Meeks v. Avery, 251 F. Supp. 245, 249.
[11] Contestants state in their brief "This brief presumes, as this court and the parties must, that there will be no special election on the petition prior to the November 2, 1982, general election."
[12] 2 U.S.C. § 7, provides:

"The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3rd day of January next thereafter."
[13] Section 5. The Congressional districts described herein shall become effective at the beginning of the terms of the members of the United States House of Representatives elected in 1982, provided however, members of the United States House of Representatives elected in 1982 shall be nominated and elected in the districts set out herein prior to receipt of any kind of certificate of election.
[1] ELECTION CALENDAR 1982:

 Regular Primary Election August 24, 1982
 Run-off Primary Election September 21, 1982
 General Election November 2, 1982

Filing period opens 8:00 a.m. the first Monday following Independence Day, July 5, and closes 5:00 p.m. the next succeeding Wednesday, July 7, 1982. 26 O.S.Supp. 1974, § 5-110.
[2] Md. Citizens for Representative General Assembly v. Gov. of Md., 429 F.2d 606, 609, 610 (4th Cir.1970). Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 1392-1394, 12 L.Ed.2d 506 (1963).
[3] 2 U.S.C. § 7: "Time of election:

The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter. This section shall not apply to any State that has not yet changed its day of election, and whose constitution must be amended in order to effect a change in the day of the election of State officers in said State." See also 2 U.S.C. § 25 et seq.
[4] 26 O.S.Supp. 1977, § 1-103 and Art. III, § 4, Oklahoma Constitution.
[5] 2 U.S.C. § 7.
[6] Representatives running at large might be suggested but if the election filing, a primary and run-off primary are actions commenced, such a suggestion is contra to our premise that elections should be orderly and not disruptive for at the present time there are no provisions for congressional elections in Oklahoma on an at large basis. Needless to say there is no directive as to the necessity of primaries, residence, etc.
[7] In Re Application of Board of Education, 565 P.2d 677, 680:

"We think the calling of the election herein can be termed a "proceeding begun." (Emphasis theirs).
[8] 8. "Vacancies.
The time for holding elections in any State, District, or Territory for a Representative or Delegate to fill a vacancy, whether such vacancy is caused by a failure to elect at the time prescribed by law, or by the death, resignation, or incapacity of a person elected, may be prescribed by the laws of the several States and Territories respectively."
[1] Hayhurst v. Hayhurst, Okl., 421 P.2d 257 (1966) and a list of eighteen cases collected at 2 Okl.Dig. 271 Appeal and Error Key 19.
[1] Unless otherwise indicated, section references in the text are to 34 O.S. 1981.